UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

UNITED STATES OF AMERICA,

    - against -

SUENDY LINVAL,

              Defendant.

------------------------------------------X

05 Cr. 345 (RWS)

SENTENCING OPINION

**Sweet, D.J.,**

11/23/05

       Defendant Suendy Linval, a/k/a "Suendy Linbal," a/k/a "Orlando DeSanto," a/k/a "Suendy Linval del Rosario," a/k/a "Swendy Linval" ("Linval") has pleaded guilty to illegal reentry after deportation subsequent to an aggravated felony conviction in violation of 8 U.S.C. 1326(a) and (b)(2), a Class C Felony. Linval will be sentenced to time served and to three years supervised release.

**Prior Proceedings**

       Linval was arrested by immigration authorities on March 28, 2005. On March 31, 2005, an indictment was filed charging Linval with unlawfully entering the United States after having been deported from the United States subsequent to an aggravated felony conviction on February 3, 2001, in New York County Criminal Court, for criminal sale of marijuana in the fourth

1

degree. On April 27, 2005, Linval appeared before the Honorable Douglas F. Eaton in the Southern District of New York and allocuted to the criminal conduct charged in the indictment without the benefit of a plea agreement. On September 12, 2005 and November 9, 2005, Linval wrote to the Court concerning his sentence. Linval is scheduled to be sentenced on November 23, 2005.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in <u>United States v. Booker</u>, 125 S. Ct. 738 (2005) and the Second Circuit's decision in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") establishing by the United States Sentencing Commission. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed --

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

2

(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for --

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;

(5) any pertinent policy statement ... [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 111.

**The Defendant**

Linval was born on October 21, 1974, in the Dominican Republic. According to Linval, because his parents had immigrated to the United States when he was a young child, he was raised in Santo Domingo, Dominican Republic by his paternal grandmother. When he was eight years old, he reportedly came to

3

New York to live with his father. Linval lived primarily in the Bronx, NY, and Manhattan, NY with his father and his father's wife.

Reportedly, Linval married Dominga Saro around 1994 in Santo Domingo, Dominican Republic. His wife and their two children remain in the Dominican Republic and have never lived in the United States. Linval also has a romantic relationship with Yesenia Polanco, who resides in the Bronx, NY, which resulted in the birth of one child.

Linval's step-mother related that although Linval was a "sweet" and "obedient" child, he was also "hyper" and at times showed a lack of control. She recalled that when the defendant was twelve years old, the school referred him for a psychological evaluation. The evaluation reportedly determined that "he had a mind of a five year old." He was subsequently placed in special education classes. Linval's stepmother believes that Linval is still hyperactive and that many of his decisions may be attributed to that.

Records reveal that Linval attended South Bronx High School in the Bronx, NY, for a total of three terms in 1991 and 1992. It is unclear which grades he completed, but the defendant reports that he left during eleventh grade because he "was not doing good." Records received from the South Bronx High School

contained a psychological examination dated April 26, 1990. He was determined to have an IQ of 69, which was categorized as mentally deficient.

Linval also attended a GED program at Alfred E. Smith High School in the Bronx, NY until December 14, 1994.

Linval has reported a history of marijuana and alcohol use, although it is uncertain whether Linval is a risk for future drug abuse.

The defendant stated that he was not working prior to his instant arrest and incarceration. Linval also reported that he has no assets and no liabilities.

**The Offense Conduct**

Linval was arrested by immigration authorities on March 28, 2005. On March 31, 2005, an indictment was filed charging Linval with unlawfully entering the United States after having been deported from the United States subsequent to an aggravated felony conviction on February 3, 2001, in New York County Criminal Court, for criminal sale of marijuana in the fourth degree. Linval declined to discuss the offense. He pleaded guilty to the above before the Honorable Douglas F. Eaton in the Southern District of New York without the benefit of a plea

agreement.

**Relevant Statutory Provisions**

The maximum term of imprisonment that may be imposed under the sole count against Linval is 20 years. See 8 U.S.C. § 1326(a) and (b)(2). If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years. See 18 U.S.C. § 3583(b)(2).

The defendant is eligible for not less than one nor more than five years' probation per count. See 18 U.S.C. § 3561(c)(1). Because the offense is a felony, one of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. See 18 U.S.C. § 3563(a)(2).

The maximum statutory fine is $250,000. See 18 U.S.C. § 3571. A special assessment is mandatory. See 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2004 edition of the United States Sentencing Commission Guidelines Manual ("the Guidelines") has

6

been used in this case for calculation purposes, in accordance with Guidelines § 1B1.11(b)(1).

The guideline for violation of 8 U.S.C. § 1326 is found in § 2L1.2(a), which provides for a base offense level of eight. Pursuant to § 2L1.2(b)(1)(C), there is an eight-level increase because the defendant was previously deported following an aggravated felony conviction as that term in defined in 8 U.S.C. § 1101(a)(43), namely for criminal sale of marijuana in the fourth degree, a Class A Misdemeanor under New York Penal Law section 221.40. See United States v. Simpson, 319 F.3d 81 (2d Cir. 2003). This results in a criminal offense level of sixteen.

Linval has shown recognition of responsibility for his offense. Therefore his offense level is reduced two levels. See § 3E1.1(a). Furthermore, a one-level reduction is warranted, because Linval gave timely notice of his intention to plead guilty. See § 3E1.1(b). The resulting adjusted offense level is thirteen.

**Criminal History**

Linval was convicted on or about February 17, 2005, for criminal impersonation in the second degree, a Class A misdemeanor, in Criminal Court, New York County, for which he was sentenced to five days' imprisonment. Under § 4A1.1(c), that

sentence results in one criminal history point.

Linval was convicted on or about January 7, 2004 for criminal diversion of prescription medications and prescriptions in the fourth degree, a Class A misdemeanor, in Criminal Court, New York County, for which he received a sentence of five days' imprisonment. Under § 4A1.1(c), that sentence results in one criminal history point.

Linval was convicted on or about September 25, 2002, for criminal possession of a weapon in the fourth degree with intent to use, a Class A misdemeanor, in Criminal Court, New York County, for which he received a sentence of time served. Because the time Linval served was for a period of less than 60 days, that sentence results in one criminal history point, under § 4A1.1(b).

Linval was convicted on or about December 18, 2001, for imitation controlled substances, a Class A misdemeanor, in Criminal Court, New York County, for which he received a sentence of conditional discharge and 2 days of community service. Under § 4A1.1(c), that sentence results in one criminal history point.

Linval was convicted on or about February 3, 2001, for criminal sale of marijuana in the fourth degree, a Class A misdemeanor, in Criminal Court, New York County, for which he

received a sentence of time served, and for which his license was suspended for six months. Under § 4A1.1(c), that sentence results in zero criminal history points because four points have already been added under that section.

Linval was convicted on or about June 28, 1995, for attempted criminal sale of a controlled substance in the third degree, a Class C felony, in Criminal Court, New York County, for which he was sentenced to five years probation. Under § 4A1.1(c), that sentence results in zero criminal history points because four points have already been added under that section.

In accordance with the above, the defendant has a total of four criminal history points, which places him in Criminal History Category III.

**Sentencing Options**

Based on a total offense level of thirteen and a Criminal History Category of III, the Guidelines range of imprisonment is eighteen to twenty-four months.

The guideline range for a term of supervised release is at least two years but not more than three years. See § 5D1.2(a)(2). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required, but is

optional. See § 5D1.1(b). Supervised release is required if the Court imposes a terms of imprisonment of more than one year or when required by statute. See § 5D1.1(a).

Because the applicable guideline range is in Zone D of the Sentencing Table, Linval is not eligible for probation, pursuant to § 5B1.1, application note #2.

The fine range for the instant offense is from $3,000 to $30,000. See § 5E1.2(c)(3)(A) and (B).

**The Remaining Factors of Section 3553(a)**

Having considered the Guidelines calculations, as set forth above, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a). Pursuant to all of the factors, and in particular 18 U.S.C. § 3553(a)(5) and (6), imposition of a non-Guidelines sentence is warranted here.

Section 3553(a)(6) instructs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). A number of courts, including some courts in this district, have recognized the unwarranted sentencing disparities that result from so-called "fast track" programs for dealing with illegal reentry cases. See United

States v. Krukowski, 04 Cr. 1309 (LAK); United States v. Vernal Mark Deans, 03 Cr. 387 (KMW). It is determined that the sentencing disparity created here is unreasonable and warrants the imposition of a non-Guidelines sentence.

As way of background, in response to the increasing number of illegal reentry arrests in certain geographical areas, a number of judicial districts began utilizing fast-track programs to manage charges brought under § 1326 more efficiently. The programs work as follows:

> Through charge bargaining or stipulated departures, these programs allow a § 1326 offender who agrees to a quick guilty plea and uncontested removal to receive a reduced sentence . . . In the Southern District of California, for example, defendants subject to 20 year statutory maximums and guideline ranges of 70-87 months were allowed to plead guilty to an offense carrying a two year statutory maximum penalty. See United States v. Banuelos-Rodriquez, 215 F.3d 969 (9th Cir. 2000). In other border districts, defendants received downward departures to induce fast pleas. See [Erin T. Middleton, Fast-Track to Disparity: How Federal Sentencing Policies Along the Southwest Border Are Undermining the Sentencing Guidelines and Violating Equal Protection, 2004 UTAH L. REV. 827] at 829-30. Recently, in the PROTECT Act, Congress made fast-track programs official, see Middleton, at 838-40, and the Commission then enacted a guideline, § 5K3.1, providing for a 4 level departure on the government's motion pursuant to an early disposition program.

United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 963 (E.D. Wis. 2005). In other words, in districts utilizing fast-track programs, offenders agree to a quick removal, saving the Government resources, and in return they receive reduced sentences.

11

Because offenders pleading guilty to illegal reentry in border districts with fast-track programs receive substantially lower sentences than those pleading guilty in other jurisdictions (such as the Southern District of New York), the defendant argues that the imposition of a sentence within the Guidelines range would create an unwarranted sentencing disparity between his sentence and the sentences imposed on defendants in fast-track jurisdictions.

The Government contends that Congress' enactment of the Protect Act in 2003 reflects a legislative determination that any disparities created as a result of the use of fast-track programs are warranted, that the charging decisions made within fast-track programs amount to exercises of prosecutorial discretion, and therefore result in warranted disparities, and that the disparity caused by fast-track programs is warranted in light of the absence of resources necessary to deal with the "explosion of illegal reentry cases in the Southwest without fast-track." Finally, it contends that the imposition of non-guideline sentences in cases like this would create greater disparities in the system.

Confronted with these contentions from the Government, the Honorable Lewis A. Kaplan recently rejected the Government's position that the sentencing disparities that arise from fast-track programs are not unwarranted within the meaning of Section

12

3553(a)(6). See United States v. Krukowski, 04 Cr. 1309 (LWK). After ordering the Government to submit a comprehensive listing of the DOJ-approved fast-track disposition Guidelines for the 13 participating districts, Judge Kaplan explained:

> The question is when Section 3553(a)(6) speaks of "unwarranted sentencing disparities" what are the criteria against which one is to determine whether any given disparity is unwarranted? Inasmuch as the statute speaks of imposing a sentence that considers "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," the text of the Sentencing Reform Act strongly suggests that the measure of whether a disparity is warranted depends upon the characteristics of the defendants and their conduct, not overall considerations of law enforcement efficiency or administrative convenience.

United States v. Krukowski, 04 Cr. 1309 (LAK), Sent. Tr. at 5. Although Judge Kaplan ultimately declined to impose a non-Guidelines sentence based upon consideration of all of the 3553(a) factors, his determination of the meaning of "unwarranted disparities" is persuasive.

Also in this district, on October 28, 2005, the Honorable Kimba M. Wood imposed a non-Guidelines sentence based upon the unwarranted sentencing disparity in illegal reentry cases. See United States v. Vernal Mark Deans, 03 Cr. 387 (KMW). Judge Wood found that most fast-track illegal reentry jurisdictions on average reduce a sentence by four offense levels, and accordingly rejected the Guidelines range of seventy-seven to ninety-six months and imposed a sentence of fifty-one months.

13

While fast-track programs may create an efficient solution to an explosion of illegal reentry cases in border districts, they nevertheless result in the type of sentencing disparity cautioned against in section 3553(a)(6). As the Court in Galvez-Barrios, 355 F. Supp. 2d at 963, explained: "Because they operate only in certain districts (typically in southwestern states), an illegal alien stopped in California or Arizona will receive a lighter sentence than an alien convicted of the same offense and with the same record who is found in Wisconsin."

Courts confronted with this issue have also noted that the amount of the reduction one receives in a fast-track sentence is substantial. In the instant case, the defendant would be reduced from 18 months to 8 months, on the lower end of the range. As Judge Kaplan noted, "it is difficult to imagine a sentencing disparity less warranted than one which depends upon the accident of the judicial district in which the defendant happens to be arrested." United States v. Bonnet-Grullon, 53 F. Supp. 2d 430, 435 (S.D.N.Y. 1999), aff'd, 212 F.3d 692 (2d Cir. 2000). Because the disparity created is of the type envisioned by § 3553(a)(6), under Crosby, it is appropriate for the Court to exercise discretion to minimize the sentencing disparity that fast-track programs create.

Section 3553(a)(5) also instructs this Court to consider policy statements issued by the Sentencing Commission in

14

determining whether a non-guideline sentence should be imposed. The Sentencing Commission itself has expressed serious concern about the unwarranted disparities that result from fast-track programs. As the Commission explained:

> The statutory requirement that the Attorney General approve all early disposition programs hopefully will bring about greater uniformity and transparency among those districts that implement authorized programs. Defendants sentenced in districts without authorized early disposition programs, however, can be expected to receive longer sentences than similarly-situated defendants in districts with such programs. This type of geographical disparity appears to be at odds with the overall Sentencing Reform Act goal of reducing <u>unwarranted</u> disparity among similarly-situated offenders.

Report to Congress: Downward Departures from the Federal Sentencing Guidelines at 66-67 (emphasis added). In identifying the disparities that result from early disposition programs, like fast-track programs, the Sentencing Commission invoked the specific language of § 3553(a)(6), "unwarranted disparity," and highlighted the type of geographical disparity present here. Accordingly, the policy statement of the Sentencing Commission also militates in favor of imposing a non-Guidelines sentence based on its judgment that geographical disparities, like those resulting from fast-track programs, result in unwarranted disparities in sentencing.

Based upon the foregoing, and consideration of, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for

15

the sentence to reflect the seriousness of the offense, to afford adequate deterrence, and to protect the public from future crimes, it is determined that a non-Guidelines sentence which addresses the unreasonable sentencing disparities resulting from fast-track programs is sufficient "but not greater than necessary" to punish Linval for the instant offense.

**The Sentence**

It is determined that based upon Judge Wood's estimate that the average fast-track sentence is reduced by four-levels, see Vernal Mark Deans, 03 Cr. 387 (KMW), Linval is more appropriately sentenced at an offense level of nine than at thirteen. An offense level of nine and a Criminal History Category of III results in a Guidelines range of eight to fourteen months. Given that Linval has already been incarcerated for eight months, in addition to a month during which he was held in the custody of Immigration authorities, Linval is hereby sentenced to time served.

Linval is also hereby sentenced to three years supervised release. Linval shall report to the nearest Probation Office within 72 hours of release from custody, and supervision will be in the district of his residence.

As mandatory conditions of supervised release, Linval

shall (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any unlawful use of a controlled substance; (5) submit to one drug testing within fifteen days of placement on supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and (6) cooperate in the collection of DNA as directed by the probation officer.

Linval shall comply with the standard conditions of supervision and shall also comply with the following special condition: he shall obey the immigration laws and comply with the directives of immigration authorities.

Linval shall also pay to the United States a special assessment in the amount of $100, which shall be due immediately. Given Linval's inability to pay a fine, the fine in this case is waived.

It is so ordered.

**New York, NY**
**November 23, 2005**

ROBERT W. SWEET
U.S.D.J.